# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 16

*October Term, A.D. 2019*

*February 5, 2020*

THE UNAUTHORIZED PRACTICE
OF LAW COMMITTEE, WYOMING
STATE BAR,

Petitioner,

v.

CLYDE W. STOCK,

Respondent.

D-19-0005

## ORDER ENJOINING THE UNAUTHORIZED PRACTICE OF LAW

[¶1]   **This matter** came before the Court upon the "Findings of Fact, Conclusions of Law and Recommendations of the Committee on the Unauthorized Practice of Law," filed herein December 30, 2019, by the Unauthorized Practice of Law Committee of the Wyoming State Bar (the Committee).   After a careful review of the Committee's recommendations and the file, this Court finds the Committee's Recommendations should be approved, confirmed and adopted by the Court.  It is, therefore,

[¶2]   **ADJUDGED AND ORDERED** that the "Findings of Fact, Conclusions of Law and Recommendations of the Committee on the Unauthorized Practice of Law," which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further

[¶3]   **ADJUDGED AND ORDERED** that Respondent Clyde W. Stock is hereby enjoined from engaging in the unauthorized practice of law.  Rule 7(d)(1), Rules of Procedure Governing Unauthorized Practice of Law; and it is further

[¶4]   **ORDERED** that on or before June 1, 2020, Respondent Clyde W. Stock shall remit a fine of $4,000 to the Wyoming State Bar.  Rule 7(d)(2), Rules of Procedure Governing Unauthorized Practice of Law.  If Respondent fails to pay the fine in the time allotted, execution may issue on the fine; and it is further

[¶5]    **ORDERED** that on or before June 1, 2020, Respondent Clyde W. Stock shall make restitution of $4,464 to Dan Carey.   Rule 7(d)(3), Rules of Procedure Governing Unauthorized Practice of Law.   Respondent shall provide proof of such payment to the Committee.   If Respondent fails to make restitution in the time allotted, execution may issue on the restitution award; and it is further

[¶6]    **ORDERED** that on or before June 1, 2020, Respondent Clyde W. Stock shall reimburse the Committee for costs of this proceeding in the amount $5,877.67, by paying that amount to the Wyoming State Bar.   Rule 7(d)(4), Rules of Procedure Governing Unauthorized Practice of Law.   If Respondent fails to make payment in the time allotted, execution may issue on the cost award.

[¶7]    **DATED** this 5th day of February, 2020.

BY THE COURT:

/s/

**MICHAEL K. DAVIS**
**Chief Justice**

BEFORE THE SUPREME COURT

STATE OF WYOMING

In the matter of ）
                ）
CLYDE W. STOCK, ）        UPL Nos. 2018-005 and 2018-006
                ）
Unauthorized practice of law respondent. ）
                ）

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATIONS
OF THE COMMITTEE ON THE UNAUTHORIZED PRACTICE OF LAW**

---

THIS MATTER came before the Committee on the Unauthorized Practice of Law ("Committee") for hearing of Bar Counsel's Petition for Civil Injunction and Other Relief. The duly-noticed hearing was held on the 3rd day of December, 2019, at the Sweetwater County Courthouse in Green River, Wyoming. A quorum of the Committee, comprised of Christine Stickley (Chair), Elizabeth Gagen, Melissa Owens, Michelle Connell, Anna Olson and Grant Lawson, was present.[1] Appearing on behalf of the Wyoming State Bar were Mark Gifford, Bar Counsel, Melinda McCorkle, Deputy Bar Counsel, and Shannon Howshar, Assistant to Bar Counsel. Respondent did not appear; as a result, the hearing proceeded as a default hearing.

The Committee, having heard the testimony of witnesses, having received certain exhibits into evidence, having reviewed the pleadings on file in this matter and being fully informed in the premises, FINDS, CONCLUDES and RECOMMENDS as follows:

### Findings of Fact

1.      In late February 2018, Thayne attorney, Kevin Voyles, notified the Wyoming Office of Bar Counsel and others of allegations that Freedom resident, Clyde Wallace Stock, had

---

[1] Owing to road closures between Casper and Green River, Ms. Olson and Mr. Lawson attended by telephone.

engaged in the unauthorized practice of law ("UPL"). **Exhibit BC-1.** Stock's filings in this matter indicate that he considers himself a sovereign citizen who frequently files declarations to that effect with the Lincoln County Clerk. *See, e.g.,* **Exhibit BC-15.** According to Voyles' letter, the victims of Stock's UPL were Voyles' longtime clients, Richard and Geraldine Casull, residents of Freedom, Wyoming. According to Voyles' letter, "Mr. Casull is terminally ill with cancer and Mrs. Casull is incapacitated with dementia."

2.     Mr. Casull died May 6, 2018, at age 87. Biographical information about Mr. Casull is readily available online and identifies him as "a Salt Lake City-born gunsmith and wildcat cartridge developer whose experiments with .45 Colt ammunition in the 1950s led to the creation of the .454 Casull cartridge. Casull's passion was six-shooters, and he was determined to create a high velocity round for the .45 Colt." In 1978, Casull and a partner created Freedom Arms in Freedom, Wyoming. His online obituary indicates that Casull died in Freedom, Wyoming, and is buried in Freedom Cemetery in Freedom, Idaho. The obituary reports, "Dick held 17 major firearm patents and was voted Outstanding American Hand Gunner in 1987 along with many other awards over the years." According to her online obituary, Geraldine Casull died February 19, 2019. She was 87.

3.     Freedom is an unincorporated community located in northwestern Lincoln County, Wyoming, and straddles the Wyoming-Idaho line. The 2010 census lists the population of Freedom, Wyoming, at 214.

4.     According to Voyles' letter to Bar Counsel, the Dick and Jeri Casull Living Trust was created in 2007 and was prepared by Bowers Law Firm in Afton, Wyoming (*see* copy of 2007 trust agreement, **Exhibit BC-2**). Thereafter, Casulls hired Voyles to amend the trust agreement twice, once in 2010 (UPL 045-048) and again in 2016 (UPL 042-044).

2

5. With respect to Stock's involvement with the trust, Voyles' letter provided the following narrative:

In October, 2017, Mr. Stock convinced Mr. Casull to execute what is titled the "D & G Bullet Trust, a business trust" [*see* **Exhibit BC-3**], supposedly in irrevocable complex trust. He told Mr. Casull the trust would protect his business assets but would not include his personal property. Mr. Stock made himself one of the "trustees" in the "trust" document.

Mr. Stock had Mr. and Mrs. Casull sign a quitclaim deed that put their real property – which includes their personal residence – into the "trust". That action showed his complete misrepresentation to Mr. and Mrs. Casull of what was being accomplished through the documents he was asking them to sign. Furthermore, it is my opinion that due to her mental infirmity, Mrs. Casull clearly lacked capacity to sign a deed.

Finally, Mr. Stock had Mr. Casull execute a new power of attorney that has designated him as Mr. Casull's Attorney-in-Fact [*see* **Exhibit BC-8**]. He also had Mrs. Casull sign a new power of attorney that made Mr. Casull her Attorney-in-Fact [*see* **Exhibit BC-7**]. It is my opinion that Mrs. Casull lacked capacity to sign such a document.

As the grand finale of Mr. Stock's "estate planning" efforts for Mr. and Mrs. Casull, Mr. Stock advised them not to "let the lawyers" know what they had executed. He explained that the lawyers "would not understand" and would "only mess things up".

To the best of my knowledge, information, and belief, it is my opinion that Mr. Casull did not read and did not understand the "trust" proffered by Mr. Stock. It is my opinion that Mr. Casull had no idea that the title to his property is no longer in his name and that of his wife as Trustees of their 2007 Trust. And it is my opinion that Mrs. Casull has no understanding of anything that has transpired as a result of Mr. Stock's actions.

6. Voyles' letter continued, "It is likely that legal action will be necessary to clear the title to [Casulls'] real property since it has been clouded by the conveyance to a purported 'irrevocable trust'. ... It is also my opinion that Mr. Stock needs to be stopped from preying on elderly people in such fashion. ... Mr. Stock should be held responsible, and he should be estopped from harming others."

3

7. On April 13, 2018, Voyles sent an email to the Office of Bar Counsel advising that Voyles had obtained a title guarantee insuring the property title for the 2007 trust. Attached to his email were several affidavits, all reportedly prepared by Stock. *See* **Exhibit BC-10.** The attachments included an affidavit from Martin T. Occhi, who testified that Stock had asked him to serve as a trustee on the D & G Bullet Trust in October 2017. Also attached was an affidavit from Stock, who testified that he prepared the two powers of attorney at Dick Casull's request and that he reviewed the 2007 Trust, also at Casull's request:

> I did read [the 2007 Trust Agreement], and then told him that I did not know if that living trust would protect his assets or not. I then told him that Rea [Stock] and I had a trust that protected us several times from lawsuits, and that could have lost everything we had, if it had not been for the Trust that was in place. He then asked me if I could help him get a trust, like what Rea and I used that would protect his and Geri's property.

UPL 088.

8. On April 24, 2018, the Office of Bar Counsel received a formal UPL report from Jackson attorney, Andrew Irvine, who submitted the report on behalf of M. Daniel Carey, an adult nephew of Casulls. **Exhibit BC-11.** The report named both Stock and Occhi as respondents and provided the following narrative:

> Mr. Stock and Mr. Occhi provided advice, expressed legal opinions and drafted legal documents for Mr. Richard Casull and Mrs. Geraldine B. Casull without having been admitted to practice law in Wyoming. Mr. Casull is dying of cancer and does not have the capacity or will to manage his property and personal affairs. Likewise, Mrs. Casull suffers from severe dementia and lacks capacity to make decisions for herself. It appears that Mssrs. Stock and Occhi preyed on this sick and elderly couple in order to undo their long-standing trust agreement and take their property and assets for their own.

9. Attached to the report were Voyles' letter of February 20, 2018 (**Exhibit BC-1**), along with copies of the documents allegedly prepared by Stock and Occhi, most of which had been attached to Voyles' letter.

4

10. In early May 2018, a letter of inquiry was sent by Bar Counsel to Stock, along with a copy of Irvine's UPL report. Mr. Stock was asked to respond in writing by May 23, 2018. **Exhibit BC-12**.

11. Stock's response, dated May 18, 2018, was received on May 29, 2018 (**Exhibit BC-13**):

Dear Mr. Gifford:

Thank you for giving me the option of answering this Complaint myself, and not have to use an attorney. I am in my 84th year and the caretaker of my invalid wife of 65 years. I have limited income, so I appreciate your consideration.

I have never intended to practice law. I do not know how to practice law. If what I did appeared to be the practice of law, I apologize. At Dick [Casull]'s request, I did adapt our estate plan (the trust) over to Dick and Geri, so they would have some asset protection. I duplicated Dick's original trust, just as he requested. My intent was only to help an old friend of mine for over 50 years, and not to practice law.

As for the egregious claims made by M. Daniel Carey/AndreIrvine [sic] and Kevin Voyles, I, would be happy to answer the charges point by point any time you want to see my response. I know you are busy, so I will not take your time to answer their egregious claims at this time. There may be a law firm in Salt Lake City ready to counterclaim any lawsuit filed trying to extort money from me to pay Dan Cary's [sic] legal fees. They feel Dan is guilty of harassment & extortion.

I am including the 9 minute orders of the D&G Bullet Trust, just in case you are interested and have not seen them all, also My affidavit dated: 8 March 2018

I hope this will explain the situation to your satisfaction. If you need more information I would be very happy to answer any questions or supply more information.

12. Attached to Stock's response were a copy of the affidavit previously provided by Voyles along with a number of "minutes" – ostensibly, directives signed by Mr. Casull regarding his intentions for management of the trust. **Exhibit BC-9**. The "minutes" included a copy of a quitclaim deed recorded with the Lincoln County Clerk on November 1, 2017, by which Casulls purportedly transferred title to their real property to the D & G Bullet Trust. **Exhibit BC-4**. The

5

filing of this document presumably created the title problem that Voyles resolved in April 2018 by obtaining a commitment from a title insurance company for the Casulls' property that had been put in the D & G Bullet Trust.

13.     On July 10, 2018, Stock sent a letter to Bar Counsel to which he attached a list of cases pulled from the Internet which he said shows he does not need a license to practice law in any event. **Exhibit BC-14.**

14.     In order to clear up the title problems created by Stock's conduct, it was necessary for Voyles to obtain an appraisal and a title commitment. **Exhibit BC-18.** The out-of-pocket costs of that effort were $1,889.00. **Exhibit BC-17.** Legal fees associated with clearing the title exceeded $2,500.00 (*see* **Exhibit BC-16**), bringing the total expenses incurred as a result of Stock's conduct to $4,464.00.

15.     On March 29, 2019, Bar Counsel wrote to Stock as follows:

> I have completed my investigation of the above-referenced matter, which was conducted pursuant to the Wyoming Supreme Court's Rules of Procedure Governing Unauthorized Practice of Law (the "Rules"). It is my conclusion that there is indisputable evidence that you engaged in the unauthorized practice of law in Wyoming by (1) preparing the D & G Bullet Trust and related documents; (2) preparing and recording the quitclaim deed transferring the Casull property to the D & G Bullet Trust; and (3) preparing the general power of attorney of Richard J. Casull. Your actions necessitated the expenditure of significant attorney fees and related costs in clearing the title on the Casull real property and rescinding the general power of attorney.

Bar Counsel proposed to resolve the matter as follows:

> Before advancing this matter to a formal hearing before the Committee on the Unauthorized Practice of Law (the "Committee"), I would like to propose a reasonable resolution that may avoid the need for a hearing. This proposal contemplates that you enter into a consent agreement requiring you to (1) refrain any further incidents of the unauthorized practice of law; (2) make restitution; and (3) pay a fine for each incident of the unauthorized practice of law.

> Under the Rules, a person who enters into a consent agreement may be required to pay restitution. The Rules also provide that a person who enters into a consent agreement may be required to pay a fine that may range from $100.00 to $250.00

6

per incident of unauthorized practice of law. My proposal to resolve this matter by entering into a consent agreement is conditioned upon your agreement to pay restitution in the amount of $4,464.00 and a fine of $300.00 ($100.00 for each of the three incidents of unauthorized practice of law). Thus, the total amount you would be required to pay under a consent agreement is $4,764.00.

**Exhibit BC-19.**

16.     Stock did not respond to the proposal. Instead, he sent an "Express Notice of 'Waiver of Tort'" which contained an apparent offer to settle his claims against Bar Counsel and others in exchange for a payment of $620,000.00. **Exhibit BC-22.** A month later, Stock sent a "Notice of Default and Opportunity to Cure" which apparently reiterated his settlement demand. **Exhibit BC-23.**

17.     On May 13, 2019, Bar Counsel filed a Petition for Civil Injunction and Other Relief with the Wyoming Supreme Court. On May 21, 2019, the Court referred the petition to this Committee for hearing. Respondent's answer to the petition, filed June 20, 2019, begins with the following:

> Respondent is not now nor ever has been a resident of Freedom, Wyoming. Respondent disavows, past or present, any residency in any DISTRICT OF COLUMBIA territorial construct called a county. Respondent believes that no evidence exists that Respondent has ever been a resident of any county in Wyoming or any other state. Therefore, the court has no in personam jurisdiction. The BAR and their rules and power over the Respondent does not exist. Respondent has no evidence of this court's jurisdiction and believes none exists.

18.     A telephonic scheduling conference was held July 19, 2019, and was attended by Christine Stickley, Committee Chair; Mark Gifford, Bar Counsel; and Respondent Clyde Wallace Stock.

19.     Following the telephonic scheduling conference an Order Setting Dates and Deadlines was entered July 25, 2019. Deadlines were established for discovery and the pre-hearing filing of witnesses and exhibits by the parties. The matter was set for hearing on the 20th day of September, 2019, in Green River, Wyoming.

7

20.     By Order dated August 21, 2019, the location of the hearing was changed to the Sweetwater County Justice Center in Rock Springs, Wyoming. However, the September 20 hearing date remained.

21.     On September 17, 2019, Stock sent an email to Committee Chair Stickley in which he stated that he was ill and unable to attend the September 20 hearing. Chair Stickley responded with the following email:

Mr. Stock:

Although you did not provide the [medical] documentation requested, your request for a continuation of the hearing scheduled for September 20th is granted. However, because of the time and expense involved in rescheduling, there will only be one continuance granted. A default will be entered against you if you are unable to attend the next hearing date that is scheduled.

Ms. Howshar will be rescheduling the date for the hearing and will be in contact with you.

**Exhibit BC-26.**

22.     On September 30, 2019, Stock filed a "Motion for Dismissal of Case Due to Lack of Personam Jurisdiction" in which Stock argued among other things that any requirement that persons providing legal services has to be licensed to practice law is contrary to law. In the same filing, Stock admitted to preparing the D & G Bullet Trust as well as the general powers of attorney for Mr. and Mrs. Casull.

23.     On September 30, 2019, Bar Counsel filed a response in which he pointed out that Stock himself is a licensed professional, holding a dental license issued by the Wyoming Board of Dental Examiners.

24.     On October 16, 2019, an Order was entered rescheduling the hearing for December 3, 2019, in Green River, Wyoming.

8

25. On October 29, 2019, Stock filed a reply to Bar Counsel's objection to Stock's motion for dismissal. In it, Stock announced that he had requested that his dental license be cancelled.

26. On November 19, 2019, Chair Stickley entered an Order denying Stock's motion for dismissal.

27. On Sunday evening, December 1, 2019, an individual apparently acting on Stock's behalf sent Chair Stickley and Bar Counsel an email to which was attached a document entitled "Witness Testimony in the Form of an Affidavit" signed by Stock. Included with the 13-page affidavit was the following statement signed by Stock:

> This is to notify you that I will not attend the meeting on the 3rd of December. I have been very sick. I am with my daughter in Salt Lake so that she can take care of me and my wife. I am unable to even get meals or take care of my wife without help.

Stock's affidavit was not accompanied by a motion for continuance. It is significant that despite his claimed illness, Stock was able to prepare a 13-page affidavit and submit it two days before the hearing. Consistent with the notice previously provided by Chair Stickley, the December 3 hearing proceeded as a default hearing.

28. The hearing focused on Stock's commission of four separate acts constituting the unauthorized practice of law: (1) preparation of the D & G Bullet Trust dated October 26, 2017 (**Exhibit BC-3**); (2) preparation of the Quitclaim Deed dated October 26, 2017, and recorded with the Lincoln County Clerk on November 1, 2017, purporting to convey real property from Mr. and Mrs. Casull's living trust to the D & G Bullet Trust (**Exhibit BC-4**); (3) preparation of a General Power of Attorney for Geraldine B. Casull dated November 2, 2017 (**Exhibit BC-7**); and (4) preparation of a General Power of Attorney for Richard J. Casull dated November 3, 2017 (**Exhibit BC-8**). It is undisputed that Stock prepared all four documents.

9

29. At the hearing, Voyles testified that he had represented Mr. and Mrs. Casull for several years, including preparation of two amendments to their living trust (one in 2010 and a second in 2016) which had originally been prepared by the Bowers Law Firm in 2007. *See* **Exhibit BC-2.** Voyles testified that he first became aware of Stock's unauthorized practice of law when Mr. and Mrs. Casull's nephew (and principle beneficiary of their estate), Dan Carey, brought copies of the D & G Bullet Trust and related documents to Voyles' office. Upon review of the documents, Voyles identified a number of potentially harmful consequences, including a potential cloud on the title to Mr. and Mrs. Casull's residence and adjacent property.

30. Voyles set about implementing remedial measures to mitigate the damage done by Stock's conduct, including meeting with Carey and Stock and urging Stock to rescind his actions with respect to the D & G Bullet Trust as well as the quitclaim deed and general powers of attorney. Stock claimed that he never intended to harm the Casulls but was only trying to help his friends. Voyles testified that he was not persuaded by Stock's feigned innocence. Voyles suspected that this was part of a larger scheme by Stock and a few cohorts to obtain control of Casulls' estate, including a large gun collection as well as Mr. Casull's drawings and other proprietary materials relating to his numerous arms-related inventions.

31. Voyles, who has extensive experience with trusts, estate planning and real property law, was troubled by a number of unusual provisions of the D & G Bullet Trust, including:

- The Trust purported to be an irrevocable business trust.
- "Property" encompassed by the Trust included "real and personal movable or immovable property of any description and whosesoever situate including (without limiting the generality thereof) policies, cash, chose in action, deeds, titles, assignments, mortgages and loans."
- Ownership of property in the Trust would be held by the Trustees, Stock and a cohort, Martin T. Occhi, who "shall have absolute and sole authority to determine what shall constitute principal and earnings (corpus and income) and shall have authority to determine if and when distributions will be made to the Beneficiary(s)."

10

- The Trust contemplated appointment of a General Manager who would be authorized to issue "ninety-nine (99) Certificates of Capital Units (hereinafter called Capital Units) representing ninety-nine percent (99%) of the beneficial interest in the Trust Estate." The General Manager "may make loans whether secured or unsecured and whether with or without interest to any person."
- The Trustees would be entitled to reimbursement of "all direct and indirect expenses of the Trust incurred or paid on behalf of the Trust, or expenses used to maintain twenty-four hour monitoring and availability to the Trust and the Trust business(s)."
- Among the expenses to be paid by the trust were the "cost of all emergency, medical and dental care, and health, life, and retirement insurance for the Trust Officers to continue;" the "cost and maintenance of a place of business, offices and plants, and the Trust Headquarters, and furnishings, assets, supplies and personnel to properly conduct the affairs of the Trust;" and "the cost of performance awards and 'Prizes' awarded to all contract workers of the Trust and the Trust business."
- The Trust provided that the Trustees would have "absolute and uncontrolled discretion and power" and would "not be liable for any loss or damage occurring as a result of the exercise of such discretion or power."
- The Trustees "shall not be required to obtain authority or approval of any court in the exercise of any power conferred hereunder and shall not be required to make current reports or any accounting thereto."
- The Trustees were empowered to determine their own compensation.
- The Trust concluded with a provision that "all other trusts and/or wills are null & void."

32. Voyles testified that he requested a title commitment from a reputable title insurance company, Wyoming Title & Escrow. In reviewing title to the Casulls' property, the title company discovered a number of affidavits by Stock and his cohorts disclaiming any nefarious intent with respect to the D & G Bullet Trust and related documents, most if not all of which had apparently been prepared by Stock and filed with the Lincoln County Clerk. *See* **Exhibit BC-10**. Voyles testified that he was shocked when the title company indicated that the company was willing to issue a title commitment that did not list the Quitclaim Deed prepared by Stock as one of the exceptions from coverage set forth in Schedule B. *See* **Exhibit BC-18**. Voyles testified that the property is currently up for sale and could not rule out the potential for a future quiet title action even with the title commitment. Voyles estimated that the cost of such an action would be $5,000.00 to $10,000.00.

11

33. Voyles testified that the legal fees associated with curing the title problems created by the D & G Bullet Trust and the Quitclaim Deed were $2,575.00. In addition, out-of-pocket costs (the cost of an appraisal, the title company's fee and recording fees) totaled $1,889.00, bringing the total costs of remediation to $4,464.00.

34. Dan Carey testified regarding his relationship with his uncle, Dick Casull, and described Casull as the kindest person he has ever known. Carey attributes his career as a Navy and commercial airline pilot to a plane ride Carey took with his uncle when Carey was 17 years old. The Casulls never had children of their own; Carey considered Casull to be a father figure.

35. Carey testified that he and his wife, Nancy, cared for the Casulls in their final illnesses, moving Mr. Casull into their home during the final months of his life. Carey testified regarding his discovery of the D & G Bullet Trust and related documents in a notebook in Casulls' home. When Carey asked his uncle about it, Casull explained that it was a business trust that his friend, Clyde Stock, had prepared to give them better protection for their assets.

36. Carey testified regarding his meeting with Voyles who, upon review of the D & G Bullet Trust and related paperwork, had serious concerns about the potential harms posed by the documents. When Carey relayed those concerns to his uncle, Casull asked, "Can you help us get it back?" It was at that point the Carey engaged Voyles' services to implement the remedial measures discussed above.

37. Carey also testified to a brief encounter he had with Stock at a restaurant in Star Valley, during which Stock cautioned Carey against discussing the Trust with lawyers who, according to Stock, "wouldn't understand it." Carey echoed Voyles' suspicions that the Trust and related documents were part of a larger scheme by Stock and his cohorts to obtain ownership of the Casulls' estate, including Mr. Casull's gun collection, patents, drawings and inventions.

12

38.     Based on the foregoing, the Committee finds that Stock engaged in at least four incidents of the unauthorized practice of law: (1) preparation of the D & G Bullet Trust dated October 26, 2017 (**Exhibit BC-3**); (2) preparation of the Quitclaim Deed dated October 26, 2017, and recorded with the Lincoln County Clerk on November 1, 2017, purporting to convey real property from Mr. and Mrs. Casull's living trust to the D & G Bullet Trust (**Exhibit BC-4**); (3) preparation of a General Power of Attorney for Geraldine B. Casull dated November 2, 2017 (**Exhibit BC-7**); and (4) preparation of a General Power of Attorney for Richard J. Casull dated November 3, 2017 (**Exhibit BC-8**).

39.     The Committee further finds that Stock should be required to pay restitution to Dan Carey in the amount of $4,464.00.

40.     The Committee further finds that Stock should be required to pay a fine in the amount of $1,000.00 for each incident of the unauthorized practice of law, for a total fine of $4,000.00.

41.     The Committee further finds that Stock should be required to reimburse the Wyoming State Bar for costs associated with this investigation and hearing.

### Conclusions of Law

42.     Wyoming Statute § 33-5-117, entitled "Unauthorized Practice," provides, "It shall be unlawful, and punishable as contempt of court, for any person not a member of the Wyoming state bar to hold himself out or advertise by whatsoever means as an attorney or counselor-at-law."

43.     Rule 7 of the Rules Governing the Wyoming State Bar and the Authorized Practice of law provides in pertinent part:

> **Rule 7. Authorization to practice law.**
> (a) The following persons are authorized to practice law in Wyoming:
>     (1) Members of the Wyoming State Bar, as more fully delineated and subject
>         to the limitations set forth in the Bylaws of the Wyoming State Bar;

13

(2) Attorneys who have been granted pro hac vice admission as provided in Rule 8, subject to the limitations set forth in that rule;

(3) Law school clinic supervising attorneys meeting the qualifications of Rule 9, subject to the limitations set forth in that rule;

(4) Law students meeting the qualifications of Rule 9, subject to the limitations set forth in that rule; and

(5) Attorneys meeting the qualifications of Rule 5.5(d) of the Wyoming Rules of Professional Conduct, subject to the limitations set forth in that rule.

(b) "Practice law" means providing any legal service for any other person, firm or corporation, with or without compensation, or providing professional legal advice or services where there is a client relationship of trust or reliance, including appearing as an advocate in a representative capacity; drafting pleadings or other documents; or performing any act in a representative capacity in connection with a prospective or pending proceeding before any tribunal.

44.    The Rules of Procedure Governing Unauthorized Practice of Law Proceedings provide in pertinent part:

Rule 5. Investigation.
***
(f)    If, after conducting an investigation, Bar Counsel believes that the respondent has engaged in the unauthorized practice of law, Bar Counsel may do one or more of the following:

(1) commence civil injunction proceedings as provided in Rule 6;

(2) commence civil contempt proceedings as provided in Rule 8;

(3) enter into a consent agreement with the respondent in which the respondent agrees to do one or more of the following:

(A) refrain from the conduct in question;

(B) refund any fees collected;

(C) make restitution;

(D) pay a fine that may range from one hundred dollars ($100) to two hundred and fifty dollars ($250) per incident of unauthorized practice of law.

Rule 6. Civil injunction proceedings.
(a)    If Bar Counsel determines that civil injunction proceedings should be instituted against a respondent, including when seeking approval of a consent agreement entered into under subparagraph (3) of paragraph (f) of Rule 5, Bar Counsel may commence such proceedings in the name of the Committee by filing a petition in the Supreme Court. The petition shall be in writing and shall set forth the facts and charges in plain language and with sufficient particularity to inform the respondent of the acts that Bar Counsel contends constitute the unauthorized practice of law. The petition shall specify the requested relief, which may include, without limitation, injunction, refund, restitution, a fine, and assessment of costs of

14

the proceeding, or the approval of a consent agreement. Bar Counsel shall, at the time of filing the petition, serve a copy upon the respondent by certified mail.

(b) Upon receipt of a petition filed by Bar Counsel in accordance with paragraph (a) of this rule, the Court may issue an order referring the matter to the Committee for further proceedings in accordance with paragraphs (d) through (h) of this rule.

(c) If the Court refers a case to the Committee under paragraph (b) of this rule, the Court shall order the respondent to file with the Committee a written answer admitting or denying the matter stated in the petition. Unless otherwise ordered by the Court, the answer shall be filed within twenty (20) days after service of the Court's order on the respondent.

\*\*\*

(h) Notice of findings, conclusions, and recommended disposition.

(1) Within thirty (30) days of receipt of the parties' proposed findings of fact, conclusions of law, and recommended disposition of the case, the Committee shall submit to the Supreme Court the record of the hearing and a written report setting forth the Committee's findings of fact, conclusions of law, and recommended final disposition of the case. A copy of the written report shall be mailed to respondent and Bar Counsel.

(2) If the Committee concludes in the report that the respondent has engaged in the unauthorized practice of law, then the Committee may recommend that a fine be imposed for each incident of unauthorized practice of law; the minimum fine for each incident shall be not less than two hundred and fifty dollars ($250) and not more than one thousand dollars ($1000).

Rule 7. Determination by the Supreme Court.

(a) Respondent may file a response with the Court to the Committee's report and recommendations within thirty (30) days of mailing of the report and recommendations to respondent. Respondent shall mail a copy of the response to Bar Counsel. A response shall state respondent's objections to the written report.

(b) The Court may, in its discretion, order respondent or Bar Counsel to file briefs on any issue the Court determines appropriate and may order oral argument before the Court.

(c) After reviewing the Committee's report and recommendations, any response by respondent, the record, and any briefs and oral argument submitted by the parties, the Court may adopt, modify, or reject the Committee's recommendations, in whole or in part, and shall determine as a matter of law whether the respondent has been engaged in the unauthorized practice of law or, in the case of a consent agreement, whether to accept or reject the agreement. In reaching its decision, the Court will give due consideration to the Committee's factual findings. The Court will review de novo the Committee's conclusions of law and recommended disposition.

(d) If the Court finds that the respondent has engaged in the unauthorized practice of law, the Court may enter an order granting any or all of the following relief:

(1) enjoining the respondent from further conduct found to constitute the unauthorized practice of law;

(2) imposing on the respondent any fines recommended by the Committee;

(3) ordering restitution;

(4) assessing the costs of the proceedings against the respondent; and/or

(5) ordering such other and further relief as the Court deems proper.

***

Rule 11. General provisions.

(a) In determining whether particular conduct involves the unauthorized practice of law, Bar Counsel, the Committee and the Court shall be guided by the following principles:

(1) The Court's rules regarding the authorized practice of law.

(2) The core element of practicing law is the giving of legal advice to a client. Factors to be applied in determining between legal and non-legal advice include:

(A) the specificity of the advice;

(B) the likelihood that the advice will be erroneous; and

(C) the degree of harm to the recipient if the advice is erroneous.

(3) Any activity which calls for the exercise of discretion, such as interviewing or advising another about the legal effect of certain choices, involves the practice of law.

(4) Receiving money for drafting documents or performing other services involving legal matters constitutes the practice of law.

(5) Holding one's self out as qualified to assist others in legal matters constitutes the practice of law.

(6) The reason for restricting the practice of law to lawyers is to protect the public.

(7) In the absence of case law in Wyoming, deference should be given to the weight of authority from other jurisdictions.

***

## Recommendations

Based upon the foregoing findings of fact and conclusions of law, the Committee recommends that the Court issue an order:

1. Enjoining Respondent from further conduct constituting the unauthorized practice of law;

2. Imposing fines upon Respondent in the amount of $4,000.00;

3. Requiring Respondent to pay restitution to Dan Carey in the amount of $4,464.00; and

4.      Assessing the costs of these proceedings against Respondent.

DATED this ___13th___ day of December, 2019.

Christine Stickley, Chair
Committee on the Unauthorized Practice of Law
Wyoming State Bar